**APPLETREE SQUARE 1 LIMITED PARTNERSHIP, CHRC of Bloomington, Inc., its general partner, and Crimark Office Building Associates Limited Partnership, its general partner, Plaintiffs,**

v.

**W.R. GRACE & CO., individually and as successor in interest to the Zonolite Company, Western Mineral Products Co., Inc., Multibestos Company, the Dewey & Almy Chemical Company, Universal Zonolite Company and all other predecessor companies, Defendants.**

Civ. No. 3–92–701.

United States District Court,
D. Minnesota,
Third Division.

Feb. 25, 1993.

James Rubenstein and Timothy Staum, O'Connor & Hannan, Minneapolis, MN, for plaintiffs.

Hugh V. Plunkett, III, Donald Lewis, and Patrick A. Reinken, Popham, Haik, Schnobrich & Kaufman, Minneapolis, MN, for defendants.

## MEMORANDUM OPINION AND ORDER

KYLE, District Judge.

### Introduction

Plaintiffs Appletree Square 1 Limited Partnership ("Appletree 1"), CHRC of Bloomington, Inc. ("CHRC"), and Crimark Office Building Associates Limited Partnership ("Crimark"), (collectively, "Appletree Partnership") commenced this action against W.R. Grace & Co., individually and as successor in interest to several corporations (collectively "Grace"). In their Complaint, the Appletree Partnership alleges that Grace's manufacture, distribution, and sale of a fireproofing material containing asbestos subjected it to liability under various State common law theories and violated the Racketeer Influenced and Corrupt Organization Act, Title IX of the Organized Crime Control Act of 1970, as amended, §§ 1961–1968 (Federal RICO). The above-entitled action is before the court pursuant to Grace's Motion for Partial Summary Judgment on Appletree Partnership's claims under State law. The Motion is based upon the ground that all such claims are time-barred under applicable statutes of limitations.[1]

### Background

Plaintiff Appletree Partnership is comprised of a Minnesota limited partnership and its general partners. At all relevant times, plaintiff CHRC was the managing partner of the Appletree Partnership.[2]

Defendant W.R. Grace is a Connecticut corporation; it has merged with and/or is the successor in interest to Western Mineral Products Co., Inc., Multibestos Company, the Dewey & Almy Chemical Products Co., Inc., Universal Zonolite Co., and the Grace Zonolite Division.

---

1. In its Complaint, Appletree Partnership alleges the following state-law claims: Count I—Strict Liability; Count II—Negligence; Count III—Nuisance; Count IV—Breach of Warranties; Count V—Misrepresentation and Fraud; Count VI—Restitution; Count VII—False Advertising and Consumer Fraud; Count VIII—Conspiracy; and Count IX—Concert of Action.

2. Both parties refer to CRI, Inc. when discussing the factual background of this action as well as the substance of the motion. CRI holds almost the entire interest in CHRC and Crimark, which are Appletree Square's general partners. Reinken Aff., Exh. E. It is undisputed that personnel from CRI were involved in managing the Appletree Project on behalf of the plaintiffs. Because of this relationship, acts done and statements made by agents and employees of CRI will be attributed to Appletree Partnership.

Appletree Partnership owns One Appletree Square ("Appletree Project"), an office building development located in Hennepin County. The Appletree Project was designed and built by Ellerbe Becket, which also was the original owner. The Project consists of two separate commercial buildings, Building 8009 and Building 8011. At the time that this action was commenced, Building 8009 was a sixteen year old, fifteen story office building with two sub-grade floors and an attached four-level garage. Building 8009 is used by the tenants leasing space in the building, by maintenance and other administrative staff, and by the general public.

The Appletree Project was substantially completed and occupied in 1974. It is constructed of reinforced concrete with steel support beams. During the construction process, an asbestos-containing fireproofing product, Mono–Kote, was sprayed on the structural steel in Building 8009.

On September 21, 1981, Ellerbe sold the Appletree Project to Appletree Square One Limited Partnership. The original partners of Appletree Square One Limited Partnership were, as general partners, Crimark, CHRC, and Applemark, Inc.; the original limited partners were Capital Income Properties—XX and Investmark, Inc.

On October 28, 1985, there was a sale of partnership interest from Investmark, Inc. to Capital Investment Company Limited Partnership IV. After this sale, the ownership interest of the Appletree Project was held by the Appletree Partnership.

Until October 1986, the Appletree Project was managed by an affiliate of Ellerbe and a third party management organization. On October 1, 1986, management of the Appletree Project was taken over by Appletree Properties, Inc. ("Appletree Properties"), an independent organization serving as Appletree Partnership's agent. There is some dispute as to whether Appletree Properties had authority to make decisions affecting the Appletree Project, but it is undisputed that Appletree Properties was in close contact with the Appletree Partnership or its agents and/or employees.

In December 1986, Appletree Properties President Darryl Durheim was contacted by Thomas Kromroy, a former employee of Ellerbe Becket. Kromroy expressed his belief that the Appletree Project included asbestos-containing materials. Kromroy also sent Durheim a laboratory report purporting to state that a sample of fireproofing from Building 8009 contained asbestos. Kromroy did not, however, tell Durheim about any hazards connected with asbestos. Durheim relayed this information to Gregory Akins, the Appletree Partnership's representative to Appletree Properties.

Thereafter, the Appletree Partnership authorized Appletree Properties to perform tests on the fireproofing in the Appletree Project. Twin City Testing, Inc.[3] performed the tests and its report dated February 9, 1987, indicates that asbestos was detectable in some areas of Building 8009, but not Building 8011. That information was transmitted to the Appletree Partnership.

In 1987, R.H. Rubin Management Corporation ("Rubin") considered purchasing the Appletree Project. After being advised by Appletree Partnership that Building 8009 contained asbestos, Rubin retained Testwell Craig Laboratories, Inc.[4] to conduct a survey of the Appletree Project. In its November 2, 1991, report, Testwell Craig confirmed that asbestos was present in Building 8009. The report also stated that the asbestos was in "poor" condition, a designation of "poor" indicating that the asbestos was highly friable and that "priority removal" was recommended. The Testwell Craig report also provided an estimate of abatement costs. Rubin eventually decided not to purchase the Appletree Project.

In January 1988, Durheim met with a representative of the Institute for Environmen-

3. Twin City Testing, Inc. is an engineering and environmental testing organization based in Minnesota.

4. Testwell Craig Laboratories, Inc. is a test engineering and environmental testing organization based in New Jersey.

tal Assessment [5] ("IEA") to discuss the asbestos situation. Also during January, Appletree Partnership authorized Appletree Properties to perform air quality testing in Building 8009. Appletree Properties retained Applied Environmental Sciences [6] ("AES") to perform the testing. AES' tests indicated that asbestos fibers were present in the air sampled, although the concentration was within state and federal standards. The test results were discussed with the Appletree Partnership.

In early 1988, Appletree Properties, with the authorization of the Appletree Partnership, engaged the law firm of Hart, Bruner, O'Brien & Thornton ("Hart, Bruner") to advise it on asbestos-related issues. Durheim Dep., at 151. On February 9, 1988, Hart, Bruner sent Appletree Properties a letter discussing hazards from asbestos exposure, state and federal regulations concerning asbestos levels, and abatement issues. A copy of this letter was provided to the Appletree Partnership. *Id.*

In early 1988, Appletree Properties placed a "hold" on above-ceiling maintenance work; its purpose was to ensure that neither maintenance personnel nor tenants would disturb the fireproofing.

In January 1990, CRI, Inc. authorized Appletree Properties to retain Hart Associates ("Hart") to perform an independent asbestos survey. A draft of the Hart report was prepared in July 1990 and a revised draft was prepared in November 1990. Thereafter, Durheim recommended to Akins that abatement procedures be instituted. Akins authorized abatement of a portion of the 8009 Building. In late 1990, Appletree Properties implemented an operations and maintenance program relating to the asbestos in the property. This action was commenced in early July 1990. The motion now before the Court seeks dismissal of plaintiffs state law claims (Counts I through IX) as being time-barred under applicable Minnesota statutes of limitation.

**5.** The Institute for Environmental Assessment is an environmental consulting firm located in Minnesota.

## Discussion

### I. Standard of Decision

Rule 56 of the Federal Rules of Civil Procedure governs motions for summary judgment. Under that Rule:

> [summary] judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). Summary judgment is to be granted only where the evidence is such that no reasonable jury could return a verdict for the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

On a motion for summary judgment, the movant bears the burden of bringing forward sufficient evidence to establish that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The evidence of the non-moving party is to be believed and all justifiable inferences are to be drawn in a light most favorable to that party. *Matsushita Elec. Indus. v. Zenith Radio*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1357, 89 L.Ed.2d 538 (1986); *Liberty*, 477 U.S. at 255, 106 S.Ct. at 2513; *Trnka v. Elanco Prod.*, 709 F.2d 1223, 1225 (8th Cir.1983). Where a moving party, with whatever it provides the court, makes and supports a motion for summary judgment in accordance with Rule 56, a party opposing the motion may not rest upon the allegations or denials of his pleadings; rather, the adverse party's response must "set forth specific facts showing that there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 256, 106 S.Ct. at 2514; *Fischer v. NWA, Inc.*, 883 F.2d 594, 599 (8th Cir.1989), *cert. denied*, 495 U.S. 947, 110 S.Ct. 2205, 109 L.Ed.2d 531 (1990).

**6.** Applied Environmental Sciences, Inc. is an environmental consulting organization located in Minnesota.

## II. Minnesota's Asbestos Revival Statute

Grace contends that Minnesota's asbestos revival statute, Minn.Stat. § 541.22, does not apply to this case and that hence, if this case is barred by a statute of limitations, it is not saved by Minn.Stat. § 541.22.[7] Appletree Partnership contends that the revival statute does apply.

■ At issue here is when this action was "begun" or commenced. It is undisputed that plaintiffs filed their Complaint in this Court on June 29, 1990. It is also undisputed that Appletree Partnership did not serve Grace with a summons and complaint until July 3, 1990. Under Minn.R.Civ.P. 3.01, "a civil action is commenced against each defendant: (a) when the summons is served upon that defendant." Under Fed.R.Civ.P. 3, "[a] civil action is commenced by filing a complaint with the court." Thus, if Minn. R.Civ.P. 3.01(a) governs, Appletree Partnership commenced this action two days after Minn.Stat. § 541.22 ceased to revive asbestos actions. If, on the other hand, Fed.R.Civ.P. 3 governs, this action was commenced before July 1, 1990, and Minn.Stat. § 541.22 may revive plaintiffs' state law claims if they are otherwise barred.

Grace contends that under the rule in *Walker v. Armco Steel*, 446 U.S. 740, 100 S.Ct. 1978, 64 L.Ed.2d 659 (1980), Minn. R.Civ.P. 3.01 controls the commencement of the action as to the state-law claims. The Appletree Partnership responds that the rule in *Walker* is inapplicable because their federal RICO claims in Count X create federal question jurisdiction. *See* 28 U.S.C. § 1331. Relying on *Hughes v. Mayo Clinic*, 834 F.2d 713 (8th Cir.1987), *cert. denied*, 487 U.S. 1210, 108 S.Ct. 2857, 101 L.Ed.2d 894 (1988), plaintiffs argue that where subject matter jurisdiction is based upon the presence of a federal question, commencement of the action as to all claims, both state and federal, is governed by Fed.R.Civ.P. 3.[8]

Appletree Partnership's argument is not supported by existing law. Since *Walker*, the rule has been that where a state statute of limitations arguably bars a state-law claim, the date of commencement must be determined according to the state's "method of commencement" statute or rule. The Court in *Walker* created the foregoing rule because it concluded that "there is no indication that [Fed.R.Civ.P. 3] was intended to toll a state statute of limitations, must less that it purported to displace state tolling rules for purposes of state statutes of limitations." 446 U.S. at 750–51, 100 S.Ct. at 1985. *Walker* concluded that Fed.R.Civ.P. 3 could co-exist with state laws establishing service as the method of commencement, at least as those laws regard statutes of limitation. *Id.* at 752, 100 S.Ct. at 1986. The Court's decision in *Walker* was premised upon the belief that the method of commencement is an integral part of the substantive scheme which promotes the policies of statutes of limitations under state law. *Id.* at 751–52, 100 S.Ct. at 1985–86.

---

7. Minn.Stat. § 541.22 provides in part:
   Notwithstanding any other law to the contrary, an action against a manufacturer or supplier of asbestos or material containing asbestos to recover for (1) removal of asbestos or materials containing asbestos from a building, (2) other measures taken to locate, correct, or ameliorate any problems related to asbestos in a building, or (3) reimbursement for removal, correction, or amelioration of an asbestos problem that would otherwise be barred before July 1, 1990, as a result of expiration of the applicable period of limitation is revived or extended. *An asbestos action revived or extended under this subdivision may be begun before July 1, 1990.*
   Minn.Stat. § 541.22, subd. 2 (emphasis added).

8. In two recent decisions arising from similar facts, this Court held that Minn.Stat. § 541.22 did not revive time-barred claims. *Metropolitan*

*Fed. Bank of Iowa v. W.R. Grace & Co.*, 793 F.Supp. 205 (D.Minn.1992) (Alsop, C.J.,) and *Concordia College Corp. v. W.R. Grace & Co.*, Civ. 3–90–0435, 1991 WL 420191 (D.Minn. Order dated Nov. 16, 1991) (Magnuson, J.). The Appletree Partnership states that these decisions are on appeal to the Eighth Circuit and thus "are of no precedential value for this Court." (Mem. Opp'n Mot. Summ. J., at 24 & n. 6.) Plaintiffs do not, however, cite any authority for this proposition, nor do they make clear why this Court should doubt the reasoning and conclusions reached in those decisions merely because they have been appealed. Those decisions carry the imprimatur of correctness. Moreover, even if they are of limited precedential value because appeals are pending, this Court may look to those decisions if it determines that their reasoning is sound.

The only difference between this case and *Walker* is that here, the plaintiffs allege both state and federal causes of action, whereas *Walker* was based on claims under state law and jurisdiction thus was premised solely on diversity of citizenship. Plaintiffs' argument notwithstanding, the presence of federal question jurisdiction as to Count X does not command a different result for the state law claims in Counts I through IX. There is no indication in case law or commentary that Fed.R.Civ.P. 3 tolls a state statute of limitations merely because a plaintiff alleges both state and federal causes of action.[9] *See* 4 Charles A. Wright and Arthur R. Miller, *Federal Practice & Procedure*, § 1057, at 191 (1969). In addition, as in *Walker*, there is no reason why Appletree Partnership's choice of a federal forum should allow it to rely on the revival statute when it would not be able to do so if this case were brought in State court. Moreover, the Eighth Circuit's decision in *Hughes* does not support Appletree Partnership's argument, as *Hughes* did not involve a statute of limitations issue.[10] Finally, the Court notes that one of the central rationales supporting the *Erie* doctrine is the desire to prevent forum shopping. If the Appletree Partnership's theory were upheld, it would promote forum shopping by encouraging plaintiffs to self-insure against delayed personal or mail service by uniformly advancing federal question claims in every situation where a state law claim is approaching the statute of limitations period. *See Piesco v. City of N.Y. Dept. of Personnel*, 650 F.Supp. 896, 900 (S.D.N.Y.1987) (holding that under *Walker*, state law controlled commencement of action where state law claim was brought under pendent jurisdiction).

### III. Minnesota's Improvement to Real Property Statute of Limitations

Minn.Stat. § 541.051 provides in pertinent part:

> Except where fraud is involved, no action by any person in contract, tort, or otherwise to recover damages for any injury to property, real or personal, ... arising out of the defective and unsafe condition of an improvement to real property, ... shall be brought against any person performing or furnishing the design, planning, supervision, materials, or observation of construction or construction of the improvement to real property ... more than two years after discovery of the injury ... nor in any event, shall such a cause of action accrue more than ten years after substantial completion of the construction.

Minn.Stat. § 541.051, subd. 1(a). Grace contends that plaintiffs' State law claims are subject to this statute of limitations and that under the statute, its state law claims are time-barred. Appletree Partnership responds that (1) Minn.Stat. § 541.051, subd. 1(a) is not applicable to this case, and (2) if it is applicable in whole or in part, summary judgment nonetheless is inappropriate.

### A. Does Minn.Stat. § 541.051 Apply?

■ Appletree Partnership offers two basic arguments in support of its position that the statute of limitations is inapplicable. First, *Minn.Stat. § 541.051 does not apply to Grace because the statute does not name*

---

9. The Court in *Walker*, 446 U.S. at 751 n. 11, 100 S.Ct. at 1985 n. 11, noted that Fed.R.Civ.P. 3 *might* toll the applicable statute of limitations where a cause of action is based on federal law. *Walker* thus indicates that the *source* of the cause of action, whether state or federal law, determines whether Fed.R.Civ.P. 3 will toll statutes of limitations. Whatever the rule where a federal law cause of action is pled, state commencement rules control where a state law cause of action is pled.

The same result would occur if plaintiffs' state law claims were within this Court's subject matter jurisdiction under principles of supplemental jurisdiction. 28 U.S.C. § 1367(a). Under supplemental jurisdiction, a federal court must follow state law where it would be required to do so

if the action were based upon diversity jurisdiction. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966).

10. In *Hanna v. Plumer*, 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965), the Court held that where a conflict exists between federal and state procedural rules, the federal rule controls if it is within the scope of the Rules Enabling Act, 28 U.S.C. § 2072, and if so, within a constitutional grant of power. 380 U.S. at 470–74, 85 S.Ct. at 1143–45. The difference between this case on the one hand, and *Hanna* and *Hughes* on the other hand, is that state "method of commencement" statutes have been construed to not conflict with Fed.R.Civ.P. 3.

"*manufacturers*" *among the persons protect-ed therein.* However, plaintiffs' argument ignores the plain language of Minn.Stat. § 541.051, to wit: "no action ... shall be brought against any person ... furnishing ... materials .... of construction [after the statute has run]." Persons who furnish materials used in constructing improvements to real property thus are among the class of persons protected by the statute. *See Griebel v. Andersen Corp.*, 489 N.W.2d 521 (Minn.1992). Moreover, plaintiffs have failed to cite any decision in which a Minnesota court has made the distinction it urges upon this Court. Absent any indication that a *Minnesota* court would distinguish between a party which manufactures products used in the construction industry, e.g., fiberglass insulation, and a party which produces materials for a specific improvement, e.g., a stained-glass window, this Court will not make such a distinction. *See Thorp v. Price Bros. Co.*, 441 N.W.2d 817, 820 (Minn.Ct.App.1989) (Minn.Stat. § 541.051 applies to persons who design or manufacture improvements to real property, even if they are not involved in the construction process).

Second, *Minn.Stat. § 541.051 does not apply to Grace because the statute applies only to actions arising out the "defective and unsafe condition of an improvement to real property," whereas they have alleged that Grace's Mono–Kote products are merely "unsafe" and not "defective and unsafe."*

■ Appletree Partnership correctly asserts that the Minn.Stat. § 541.051 applies only to injuries resulting from "defective *and* unsafe" conditions. As recently as 1992, the Minnesota Supreme Court emphasized that the foregoing phrase is stated in the conjunctive, not the disjunctive. *Griebel v. Andersen Corp.*, 489 N.W.2d 521, 523 (Minn.1992).

The court in *Griebel* expanded the definition of "unsafe" to include both "hazardous" and "insecure" conditions, but it did not conclude that "defective" and "unsafe" were fungible terms:

> we recognize alternative definitions of "unsafe" such as "insecure" and thus implement the legislature's sensible intention to provide one limitation period for claims arising out of *defective and unsafe* improvements to property regardless whether the *defect* is hazardous to human health or whether the *defect* simply renders the property insecure and vulnerable to invasion.

*Id.* (emphasis added). Grace thus is incorrect in its argument that "defective" and "unsafe" may be used synonymously.

That an improvement to real property must be both defective and unsafe does not mandate a conclusion that Minn.Stat. § 541.-051, subd. 1(a) does not apply to this case. In Count I of the Complaint, it is alleged that Grace "knew or should have known that these asbestos products were *defective* and unreasonably dangerous.... The asbestos and asbestos-containing products ... are *defective* in that they are not reasonably safe for their ordinary intended uses." ¶¶ 38–39. These and other allegations[11] establish that Appletree Partnership has alleged that its injuries have arisen out of a defective *and* unsafe condition of an improvement to real property.[12]

Finally, Appletree Partnership contends that even if Minn.Stat. § 541.051 applies to this action, it does not apply to Count III of the Complaint, which states a cause of action for nuisance, nor to that portion of Count II alleging negligence based upon a breach of a duty to warn.

11. In a state court action against the sellers of the Appletree Project, plaintiffs allege that the presence of Mono–Kote in Building 8009 is a "latent defect" in the Appletree Project. *Appletree Square 1 Limited Partnership, et al. v. Investmark, Inc., et al.*, Civil No. 91–16792 (Minn.Dist. Ct. Sept. 18, 1991), ¶ 41, *contained in* Reinken Aff., Exh. A.

12. At least one Minnesota court has indicated that definitions of "defective" are not limited to language from products liability theories. In

*Fiveland v. Bollig & Sons, Inc.*, 436 N.W.2d 478 (Minn.Ct.App.1989), the court applied a "common sense" definition of "defective" for purposes of Minn.Stat. § 541.051, subd. 1(a). Looking to the dictionary, the court held that an improvement to real property is "defective" if it contains an "imperfection or fault" or is otherwise "incomplete." *Id.* at 480. Fireproofing which contains a material that is hazardous to human health is imperfect and contains some fault.

■ Plaintiffs' argument regarding Count III fails to take account of the broad scope of Minn.Stat. § 541.051. The statute applies to actions in "contract, tort, or otherwise to recover damages for any injury to property ... arising out of the defective and unsafe condition of an improvement to real property." Minn.Stat. § 541.051. Count III alleges that the installation of asbestos "has caused a health hazard to be created in Appletree Square. This risk is a direct result of the wrongful acts of defendants ... and amounts to a public nuisance." ¶ 48. Count III clearly "arises out of" the installation of Grace's products, which is the defective and unsafe condition. Accordingly, Minn.Stat. § 541.051 applies to Count III.[13]

As for plaintiffs' "duty to warn" theory of negligence in Count II, Complaint, ¶ 45(a), the Court concludes that plaintiffs' theory is not separately cognizable from the installation of the asbestos-containing material. As a general rule, Grace's failure to warn at the time the asbestos was sold would support a cause of action under tort and thus would fall under Minn.Stat. § 541.051. In support of its argument that this general rule does not apply here, plaintiffs rely on *Horvath v. Liquid Controls Corp.*, 455 N.W.2d 60 (Minn.Ct. App.1990). In *Horvath*, the court concluded that a party who, separate from the act of selling a product, undertakes an ongoing duty to use due care in advising a party is under an ongoing duty to warn that party of dangers. *Id.* at 64.

As stated in *Horvath*, however, the question raised by the duty to warn theory is whether there was an *undertaking* of an ongoing duty to use due care in advising Appletree Partnership or its agents about the use of asbestos. At the summary judgment stage, plaintiffs must produce facts creating a genuine issue of material fact regarding whether after the Appletree Project was substantially completed, Grace undertook such a duty. *See Horvath*, 455 N.W.2d at

63–64; *Henry v. Raynor Mfg. Co.*, 753 F.Supp. 278, 283 (D.Minn.1990). Plaintiffs have failed to present this Court with any evidence that Grace provided additional information to them or their agents after the Appletree Project was substantially completed or failed to act in any way that would impose upon it an ongoing duty to warn. Accordingly, no separate duty to warn was created and Minn.Stat. § 541.051 applies to Count II in its entirety.

*B. The Limitations Periods in Minn. Stat. § 541.051*

1. The Ten Year Statute of Repose

■ Under Minn.Stat. § 541.051, subd. 1(a), claims based upon improvements to real property must be brought with ten (10) years after the improvement to real property was "substantially completed." Because it places an outside limit on causes of action arising from improvements to real property, the portion of Minn.Stat. § 541.051 containing the 10 year limit is a statute of "repose."

It is undisputed that Building 8009 was substantially completed by the end of 1974, some 16 years prior to the date on which this action was commenced. Grace argues that the plaintiffs' state law claims thus are time-barred. Plaintiffs respond that it cannot be said as a matter of law that the 10-year statute of repose applies here, as there is a genuine issue of material fact as to whether Grace fraudulently concealed the presence and hazards of asbestos, thereby tolling the running of the statute of repose.

■ Under Minnesota law, if a defendant has by fraud prevented a plaintiff from discovering a defective and unsafe condition within ten years after substantial completion of construction, the statute is tolled until the plaintiff could, by reasonable diligence, have discovered the defective condition. *See Wittmer v. Ruegemer*, 419 N.W.2d 493, 497

---

13. The Court also notes that even if Count III was not subject to Minn.Stat. § 541.051, summary judgment would be appropriate in any event. Minnesota nuisance law does not apply in a case such as this where the alleged wrongdoer no longer owns or controls the property from which the nuisance arises. *See e.g., Highview*

*North Apartments v. County of Ramsey*, 323 N.W.2d 65, 70–71 (Minn.1982). Once W.R. Grace manufactured and sold the fireproofing to the original owner of the Appletree Project, it no longer controlled the fireproofing and consequently a nuisance action cannot be maintained against it.

(Minn.1988) (applying same rule to 15 year period in predecessor version of Minn.Stat. § 541.051). The party claiming fraudulent concealment has the burden of showing that the concealment could not have been discovered sooner by reasonable diligence on its part and was not the result of its own negligence. *Id.* at 498 n. 4. Thus, fraud is relevant to the 10–year statute of repose period only to the extent that Grace's fraud may have prevented Appletree Partnership from discovering that it had a cause of action for asbestos removal. *Independent School Dist. No. 197 v. W.R. Grace*, 752 F.Supp. 286, 290 (D.Minn.1990). Minnesota courts have defined "fraudulent concealment" as

> the concealment [which is] fraudulent or intentional and, in the absence of a fiduciary or confidential relationship, there must be something of an affirmative nature designed to prevent, and which does prevent, discovery of a cause of action.... Although mere silence or failure to disclose may not in itself constitute fraudulent concealment, any statement, word, · or act which tends to the suppression of the truth renders the concealment fraudulent.

*Wild v. Rarig*, 302 Minn. 419, 450, 234 N.W.2d 775, 795, *cert. denied*, 424 U.S. 902, 96 S.Ct. 1093, 47 L.Ed.2d 307 (1976). Absent a fiduciary or confidential· relationship, the essence of fraudulent concealment, then, is that the defendant has engaged in some behavior that has had the purpose and effect of concealing the presence of a cause of action from the plaintiff. *Henry v. Raynor Mfg. Co.*, 753 F.Supp. 278, 282–83 (D.Minn.1990). Silence in the face of knowledge does not state a claim of fraudulent concealment. *Id.*

The foregoing standard creates a two-fold inquiry. The Court must first address whether there is a genuine issue of material fact with regard to whether Grace fraudulently concealed knowledge of the hazardous nature of asbestos during the pertinent time period. *Id.* If fraudulent concealment of the facts occurred, the court must then determine whether a fact issue exists as to whether the defendant's fraudulent concealment had the effect of preventing the plaintiff from discovering the cause of action.

Plaintiffs contend that genuine issues of material fact exist with regard to both parts of the inquiry. In support of their allegations that Grace fraudulently concealed the hazards of asbestos, plaintiffs point to United States Magistrate Judge Franklin L. Noel's September 10, 1991, Order granting their motion to amend the Complaint to state a claim for punitive damages. In that Order, Magistrate Judge Noel determined that plaintiffs had established a prima facie case that Grace acted with willful indifference to the rights or safety of others by selling asbestos-containing Mono–Kote for use in the construction of Appletree Square. Order, at 15. Magistrate Judge Noel also determined that at the time it sold Mono–Kote to the builders of the Appletree Project, Grace knew that asbestos was hazardous, had a tendency to become friable, and would be a threat to building occupants if it became airborne. *Id.* at 14–15. As further support, plaintiffs incorporate by reference an affidavit and exhibits filed in support of its motion to amend the Complaint to add punitive damages and certain Answers to Requests for Admissions which were submitted by Grace during discovery.

A review of plaintiffs' submissions in support of their argument indicates that Grace engaged in a long-term campaign to prevent the *public* from learning about the hazards of asbestos generally. Apparently, plaintiffs contend that if Grace was concealing the truth about asbestos from the public, it must necessarily have been concealing the truth from them.[14]

Court decisions interpreting relevant Minnesota law indicate that Appletree Partnership has failed to create a genuine issue of material fact as to whether Grace fraudulently concealed material facts underlying a cause of action based upon the presence of Mono–Kote in the Appletree Project.

---

**14.** W.R. Grace could not of course, have been concealing the truth from the plaintiffs prior to their purchasing the Appletree Project in 1981. However, if W.R. Grace took any actions prior to 1981 that were intended to conceal the discovery of a cause of action by the original owners of the Appletree Project, those actions would have tolled the statute of repose for the duration of the concealment.

Grace's participation in an industry-wide campaign to keep the hazards of asbestos hidden from the public would not alone support a jury determination that Grace concealed the true facts about asbestos in the Appletree Project with the purpose of preventing the plaintiffs from discovering that they had a cause of action. *See Schmucking v. Mayo*, 183 Minn. 37, 38–39, 235 N.W. 633, 633 (1931) (fraudulent concealment exists when a party against whom a cause of action exists prevents another from obtaining knowledge thereof). Plaintiffs have failed to present any evidence of Grace's behavior toward the Appletree Project during the 10 years following its substantial completion. Absent such evidence, a jury could not conclude that Grace fraudulently concealed the existence of a cause of action from the Appletree Partnership.

For its part, Magistrate Judge Noel's Order does not support plaintiffs' allegations of fraudulent concealment; the order focused on W.R. Grace's knowledge about asbestos and its actions in the face of such knowledge, but only as that relates to its sale at the time the Appletree Project was built in 1973 and 1974. Selling asbestos-containing fireproofing without disclosing the presence or hazardous nature of asbestos may be improper, but absent a fiduciary or confidential relationship, mere silence is not fraudulent concealment under Minnesota law.

Because there is no genuine issue of material fact as to whether Grace engaged in fraudulent concealment, the Court need not address the second part of the relevant inquiry. Grace is entitled to summary judgment on its claim that 10–year statute of repose bars plaintiffs' claims in Counts I–III and V–IX.

2. The Two Year Statute of Limitations

Even if the ten-year statute of repose did not bar plaintiffs' state law claims, the Court concludes that the two-year statute of limitations in Minn.Stat. § 541.051, subd. 1(a) would also bar Counts I through IX of plaintiffs' Complaint. Under that statute, a plaintiff must bring an action within two years of the "discovery of the injury." The discovery of an injury triggers the running of the limitations period because it constitutes the accrual of a cause of action. Minn.Stat. § 541.-051, subd. 1(b). A plaintiff "discovers" an injury when it either actually discovers, or through the exercise of reasonable diligence should have discovered, the injury. *The Rivers v. Richard Schwartz/Neil Weber, Inc.*, 459 N.W.2d 166, 169 (Minn.Ct.App.1990).

■ In asbestos removal litigation, an "injury" is discovered and a cause of action accrues when plaintiff discovers or in the exercise of reasonable diligence should have discovered, (1) the type and amount of asbestos used in the particular building, and (2) that the presence of asbestos constituted a hazard requiring abatement.[15] *Independent Sch. Dist. No. 197*, 752 F.Supp. at 290 (citing *Independent School Dist. No. 622 v. Bor–Son Const., Inc.*, CIVIL C5–84–1701 (Minn.Dist. Ct. Mar. 25, 1987).

This action was commenced on July 3, 1990. Accordingly, if the plaintiffs discovered or should have discovered the facts giving rise to a cause of action prior to July 3, 1988, their state law claims are time-barred by the two-year statute of limitations in Minn.Stat. § 541.051, subd. 1.

Application of a proper summary judgment analysis to the facts of this case indicates that prior to July 3, 1988, the Appletree Partnership discovered, or through the exercise of reasonable diligence should have discovered, both the presence of asbestos in the Appletree Project and that the presence of asbestos was a hazard requiring abatement.[16]

---

15. The two-year limitations period is not subject to tolling for fraudulent concealment. *Wittmer*, 419 N.W.2d at 498.

16. One of the plaintiffs' central contentions is that the only party with knowledge of asbestos problems during the relevant period was Appletree Properties. This contention is without merit: numerous facts in the record indicate that Appletree Properties passed almost all informa-

tion pertaining to asbestos in the Appletree Project to representatives of the plaintiffs; Appletree Properties was plaintiffs' agent for purposes of the Appletree Project, *see Jurek v. Thompson*, 308 Minn. 191, 197, 241 N.W.2d 788, 791 (1976) (citations omitted), and its knowledge can be attributed to the plaintiffs. *See St. Paul Fire & Marine Ins. Co. v. F.D.I.C.*, 968 F.2d 695, 700 (8th Cir.1992); and plaintiffs elsewhere have alleged that they "assumed total management re-

The plaintiffs "readily" concede that they were informed of the presence of asbestos in December 1986, when they were told by Durheim that someone had "made an inquiry regarding asbestos in the Building." (Mem. Opp'n Mot. Summ. J., at 21.) This concession is supported by the lab report attached to Kromroy's December 16, 1986, letter to Durheim and the February 9, 1987, report from Twin City Testing.[17] By early 1987, then, the plaintiffs had discovered the presence of asbestos in Building 8009. The remaining issue is when they discovered, or should have discovered, that the asbestos was a hazard requiring abatement.

Numerous individual pieces of evidence exist regarding the information and recommendations which were before the plaintiffs or their agents prior to July 3, 1988. In October 1987, Bruce Bromiel of IEA sent a letter to Yokiel regarding the asbestos situation at the Appletree Project. Yokiel Aff., Exh. 54. In that letter, Bromiel stated that "[t]he correct response is to first determine what outright health risk may exist with the building, ... and to begin appropriate engineering and maintenance procedures.... Recording information in case of litigation may also be helpful." Bromiel also enclosed a copy of a paper concerning asbestos response, entitled "Asbestos and the Rational Building Manager." *Id.* This paper discussed and recommended certain steps that should be taken and mistakes that should be avoided. As of October 1987, then, Appletree Properties possessed information about the need to determine the exact nature of the asbestos in the Appletree Project and to institute procedures to address the potential hazards of asbestos.

Soon thereafter, plaintiffs themselves received specific information about the condition of the asbestos present in Building 8009. The November 2, 1987, Testwell Craig report, which was communicated to the plaintiffs, specifically stated that the asbestos in Building 8009 was "poor," which Testwell

Craig defined as "[h]ighly friable, [with a] potential for future erosion. (Priority removal, requires immediate attention)." Yokiel Dep., Exh. 55 § 7.0. The report further stated that

> [s]ince there are hung ceiling tiles on every floor, it is assumed that some of the tiles have become contaminated with asbestos fibers from fallen debris. The most decisive means of eliminating this potential hazard is to remove the asbestos containing material and replace it with a non-asbestos containing material.

*Id.* § 8.0. The report went on to estimate the cost of abating the asbestos in Building 8009, *id.* at § 9.0, and to set forth interim measures to cope with the asbestos situation.

The Appletree Partnership contend that they and their agents questioned the accuracy of the report because it had been prepared by a company retained by Rubin. However, the plaintiffs have neither alleged nor shown that the Testwell Craig report was flawed or otherwise suspect. Furthermore, whatever the perceived accuracy of the report, it can not be gainsaid that the report provided the plaintiffs with specific information about the condition of the asbestos and the need to determine whether abatement was necessary.

In January 1988, Durheim, with the authorization of plaintiffs, met with a representative from IEA. As a result of that meeting, Joan Nephew sent Durheim an "Asbestos Control Program Proposal," which outlined a five-part process for addressing the asbestos situation at the Appletree Project. The proposal included a process of evaluation and assessment of the situation, including a review of the Testwell Craig report, and an ongoing plan for monitoring the asbestos situation so as to "promote a safe and lawful building environment for workers and tenants." Durheim Dep., Exh. 78, at 1. Thus as of January 1988, a second organization had recommended that the Appletree Project

---

sponsibility" for the Appletree Project on and after October 1, 1986. (Reinken Aff., Exh. A, ¶ 39.) Accordingly, plaintiffs will be deemed to have had knowledge of any events or statements given to them or Appletree Properties at any time after October 1, 1986.

17. The factual record indicates that Durheim informed H. William Willoughby of the Twin City Testing report. According to an affidavit Willoughby signed in the *Investmark* litigation, he is a principal in plaintiffs CRHC and Crimark. (Reinken Aff., Exh. H, at 1.)

be assessed to determine whether there was a current need to abate the asbestos containing fireproofing.[18]

On February 9, 1988, Hart, Bruner submitted its letter to Appletree Properties. As discussed *supra,* Durheim testified that he engaged the law firm at the direction of plaintiffs or their representatives. *See* Durheim Dep., at 155–56. In that letter, Hart, Bruner summarized the November 2, 1987, Testwell Craig report and discussed several topics, including whether or not abatement would be required under state and federal law. Durheim Dep., Exh. 80, at 3–5. The letter stated:

> There is no obligation to go forward with abatement activities, unless the asbestos is in need of repair or is being disturbed. In other words [state and federal] regulations will not be "triggered" if the asbestos is merely friable and is in a stable condition. However, areas of exposed asbestos *should be closely monitored for repair requirements under the state regulations.* In the event that the asbestos is in a state of disrepair, the airborne concentrations may trigger the federal requirements as well.

*Id.* at 5. At the "Recommendations" portion of the letter, Hart, Bruner recommended, *inter alia,* the following:

> 1. The [Testwell Craig] report does not advise if the asbestos is *actually* in need of present repair, or simply has the *potential* to erode. That distinction is critical, since the obligations and liabilities associated with asbestos and its abatement are a function of the degree of danger posed by present conditions as well as those conditions which can be reasonably expected. You should confer with your consultants to determine the present condition of the as-

bestos found in Building 8009 and the potential causes, effects, and time frames of deterioration of the asbestos.

> 2. You should advise the maintenance personnel of the existence of the asbestos and of the precautions which should be taken to avoid disturbing it. As well, periodic inspection programs should be initiated to assure that the asbestos does not fall into a state of disrepair. The [Testwell Craig] report provides specific recommendations that should be given serious consideration.

*Id.* at 8–9 (emphasis supplied).

The Hart, Bruner letter thus specifically stated that Appletree Properties should take steps to discover the condition of the asbestos and determine whether it was in need of abatement.[19] Plaintiffs have not offered any factual evidence contradicting Durheim's testimony that their representative approved engaging Hart, Bruner and received a copy of the February 9, 1988, letter.[20] Moreover, the letter indicates that Willoughby of CRI received a copy of the letter. *Id.* at 9. Accordingly, the uncontradicted factual evidence indicates that by early February 1988, plaintiffs had been told by three separate organizations, two of which were retained by them, that given the facts known about the asbestos in Building 8009, they should take immediate steps to discover whether the asbestos present in Building 8009 was a hazard in need of abatement.

On February 12, 1988, AES took air samples in Building 8009. AES' report revealed that asbestos fibers were present in the air in Building 8009. Talmo Dep., Exh. 30. Although the concentrations was below state and federal standards, AES indicated in its

---

18. On January 27, 1988, Patrick DiBartolomeo of AES sent Debra A. Wardell of Appletree Properties a packet of information that included a document entitled "Appletree Properties, Inc., Example Asbestos Management Plan." Durheim Dep., Exh. 79. The document stated: "The following is a model operations maintenance program for a typical commercial office building. Since the asbestos hazard is known, management should take action to minimize and control asbestos exposure to both building maintenance staff, tenants and outside contractors." *Id.* at 5. This document was also before Appletree Proper-

ties as it communicated with the plaintiffs regarding the asbestos in Building 8009.

19. At Durheim's deposition, he testified that he may have written the phrase "a 'survey' would tell us this" next to the statement quoted herein. Durheim Dep., at 150.

20. Appletree Partnership did not mention the Hart, Bruner letter in either their discussion of the factual background of this action or their arguments in opposition to the summary judgment motion.

report that federal agencies have stated that any concentration of asbestos posed potential health risks. Talmo Dep., at 62–63, Exh. 30, at 3. Importantly, Appletree Properties also knew, according to the paper that IEA's Bromiel wrote and gave to Yokiel in October 1987, that a major mistake of building owners was to rely on conventional air testing, rather than more elaborate testing procedures. Yokiel Dep., at 54.

Finally, Daniel O'Donnell, the person who replaced N. Peter Talmo as Appletree Properties' maintenance supervisor, testified that when he joined Appletree Properties in March 1988, he was directed by Durheim and/or Yokiel that no work was to be performed above the hung ceiling in Building 8009 unless and until he informed them of the need to go above the ceiling and discussed it with them. O'Donnell Dep., at 97. O'Donnell further testified that Durheim and/or Yokiel stated that the "hold" on above-ceiling work was being put in place because the asbestos in the fireproofing was a potential health hazard. *Id.* at 28, 50–51, 98.

Plaintiffs contend that summary judgment is inappropriate on the two-year statute of limitations and call the Court's attention to the Supreme Court of Minnesota's statement in *Wittmer* that "if reasonable minds may differ about the time of discovery or when the [injury] should have been discovered in the exercise of reasonable diligence, the question is one for the finder of fact." 419 N.W.2d at 497. This statement merely reflects the well-accepted principle that determining knowledge or reasonable diligence involve questions of fact. That an issue is a question of fact, however, does not also mean that it may not be resolved at the summary judgment stage. Where "reasonable minds" could not differ about the time of discovery or when an injury should have been discovered in the exercise of reasonable diligence, summary judgment is appropriate. For that reason, plaintiffs reliance on *Wittmer* and *Independent School Dist. No. 197* are unavailing; those courts' conclusions about summary judgment were based on the particular facts before them.

Whether reasonable diligence would have resulted in the discovery of an injury is an objective inquiry that places the burden of discovery on the plaintiff. *The Rivers v. Richard Schwartz/Neil Weber, Inc.,* 459 N.W.2d 166, 169 (Minn.Ct.App.1990); *see Goellner v. Butler,* 836 F.2d 426, 432 (8th Cir.1988) (discussing statute of limitations for fraud actions). Such an inquiry should take into account the nature of the injury and the opportunity to discover the injury. *See Maloney v. R.J. O'Brien & Assoc., Inc.,* 819 F.2d 1435, 1442 (8th Cir.1987) (reasonable diligence in discovering fraudulent inducement). The two-year period in Minn.Stat. § 541.051, subd.1(a) commences when a plaintiff has enough facts to be on notice that a potential injury may exist; it does not await a "leisurely discovery of the full details" of the injury. *See Davidson v. Wilson,* 763 F.Supp. 1465, 1469 (D.Minn.1990), *aff'd,* 973 F.2d 1391 (8th Cir.1992) (reasonable diligence standard under 15 U.S.C. § 771(2)). Where sufficient facts are known to indicate that an injury may exist and a cause of action thus may lie, a plaintiff may not sit on its hands and wait for the full details to become available. Rather, the plaintiff must then act on what is known and conduct a reasonable investigation to discover its injury.

Taken as a whole, the facts and events discussed herein compel the conclusion that before July 3, 1988, the plaintiffs discovered or through the exercise of reasonable diligence should have discovered that the asbestos present in Building 8009 was a hazard in need of abatement before July 3, 1988. The plaintiffs contend that they were on a "learning curve" about asbestos throughout this time period and that as a result they did not "discover" that the asbestos in Building 8009 was a hazard in need of abatement until they received a draft of the Hart Associates report in 1990. What plaintiffs have failed to create is a genuine issue of material fact as to whether, had they exercised reasonable diligence, they would not have discovered the hazard before July 3, 1988.

Although no one event alone may have provided sufficient inquiry notice about the hazardous nature of the asbestos in Building 8009, the accumulation of events does demon-

# 1280

strate that by early March 1988, plaintiffs were in possession of the following information:

1. Testwell Craig's report that the asbestos was in a condition that demanded immediate attention and that it likely had contaminated the ceiling tiles in Building 8009;

2. Hart, Bruner's report recommending that Building 8009 be surveyed to determine whether the asbestos was a current health hazard;

3. an air sampling report showing that asbestos fibers were present in the air in Building 8009 and that any contamination of air by asbestos was a potential health risk; and

4. a paper written by IEA indicating that it was a mistake to rely on air sampling alone to detect the presence of asbestos.

These and other facts were sufficient to cause Appletree Properties to place a "hold" on above-ceiling maintenance work out of a concern for the health risks to its maintenance workers: plaintiffs, however, while in possession of the same facts, waited for two years to discover the actual hazard posed by the asbestos. In the securities fraud context, facts sufficient to trigger a duty to use reasonable diligence are called "storm warnings." *Cook v. Avien, Inc.,* 573 F.2d 685, 697 (7th Cir.1977). This metaphor is applicable to this case. By March 1988, the plaintiffs were in possession of sufficient facts about the hazards of asbestos generally, and the asbestos in Building 8009 specifically, to have "storm warnings" about the potential need to abate that asbestos. The presence of these indicators created a duty to use reasonable diligence to discover whether abatement was

necessary, and thereby commenced the two-year limitations period.[21] Plaintiffs failed to exercise the diligence required and their state law actions thus were filed after the limitations period had run. Accordingly, based upon the two year statute of limitations in Minn.Stat. § 541.051, subd. 1(a), Grace is entitled to summary judgment on all of the Appletree Partnership's claims in Counts I–III and V–IX.

## IV. U.C.C. § 336.2–725 Breach of Warranties Statute of Limitations

Grace also contends that plaintiffs' claims in Count IV, specifically that Grace breached expressed and implied warranties of merchantability and fitness for a particular purpose, are barred by the four-year statute of limitations in the Uniform Commercial Code. *See* Minn.Stat. § 336.2–725. Plaintiffs have not contested this issue. Accordingly, if Grace has shown that it is entitled to judgment as a matter of law, summary judgment will be appropriate.

■■■ Breach of warranty claims for goods used in construction of an improvement to real property are governed by the statute of limitations in Minn.Stat. § 336.2–725.[22] *TCF Bank & Sav. v. Marshall Truss Systems,* 466 N.W.2d 49, 53 (Minn.Ct.App. 1991), *overruled on other grounds, Lloyd F. Smith Co. v. Den–Tal–Ez, Inc.,* 491 N.W.2d 11 (Minn.1992). Under that statute, a plaintiff must bring a cause of action within four years after the date on which the action accrues. *Id.* at § 336.2–725(1). A cause of action for breach of warranty accrues when the breach occurs, regardless of the plaintiff's lack of knowledge about the breach. *Id.* at § 336.2–725(2). In the usual case, a breach of warranty occurs when the tender

---

**21.** Although fraudulent concealment on the part of W.R. Grace would be a relevant factor for determining when, in the exercise of reasonable diligence, the Appletree Partnership should have discovered that the asbestos was a hazard in need of abatement, *Wittmer,* 419 N.W.2d at 498, plaintiffs have offered nothing which would create a genuine issue of material fact as to whether W.R. Grace was fraudulently concealing the hazards of asbestos during 1986–1990.

**22.** In 1991, the Minnesota Legislature amended Minn.Stat. § 336.2–725, adding the clause "[t]his section does not apply to claims against sellers of

goods for damages to property caused by the goods where the property that is damaged is not the goods and the sale is not a sale between parties who are each merchants in goods of the kind." Laws 1991 c. 352, § 1. This amendment made the statute of limitations in Minn.Stat. § 336.2–725 inapplicable to breach of warranty claims in actions such as this and subjects all such actions to the limitations period in Minn. Stat. § 541.051. Because the statute was amended after this action was commenced, the statute of limitations in Minn.Stat. § 336.2–725 is applicable to this action.

of delivery is made. *Id.* The usual tolling rules applicable to the statutes of limitation generally are also applicable to the statute of limitations in Minn.Stat. § 336.2–725. *Id.* at 336.2–725(4).

As discussed *supra,* Part II.B.1, plaintiffs have not produced any facts warranting tolling of the limitations period. Accordingly, as it is undisputed that delivery of the fireproofing was tendered in 1973 or 1974, some sixteen years prior to the date on which this action was commenced, Grace is entitled to judgment as a matter of law on plaintiffs' breach of warranty claims in Count IV.

### Conclusion

Based on the files, records, and proceedings herein, and the briefs and arguments of counsel, IT IS ORDERED that defendant W.R. Grace's & Co.'s Motion for Partial Summary Judgment (Doc. No. 115) is GRANTED. Plaintiffs' claims against Grace in Counts I, II, III, IV, V, VI, VII, VIII and IX are DISMISSED WITH PREJUDICE.