**BELLSOUTH
TELECOMMUNICATIONS, INC.,**
Plaintiff,

v.

**W.R. GRACE & CO.—CONN., Defendant.**

**Civ. No. 3:93CV65 (TFGD).**

United States District Court,
D. Connecticut.

Dec. 16, 1994.

**534**

Edward J. Westbrook, J. Anderson Berly, III, Ness, Motley, Loadholt, Richardson & Poole, Charleston, SC, A. Camden Lewis, Mary G. Lewis, E. Pete Kilmala, Lewis, Babcock & Hawkins, Columbia, SC, Fred A. Walters, Bellsouth Telecommunications, Atlanta, GA, Lindalea P. Ludwick, New Haven, CT, for plaintiff.

David Benjamin Teitelman, Seth J. Arnowitz, Rosanne C. Baxter, Cummings & Lockwood, Stamford, CT, for defendant.

DALY, District Judge.

Approved and Adopted.

### MAGISTRATE JUDGE'S OPINION

SMITH, United States Magistrate Judge.

W.R. Grace & Co.—Conn., ("Grace") the defendant in this tort action brought under Connecticut's Comprehensive Products Liability Act., Conn.Gen.Stat. § 52–572m et seq. (Supp.1990), has moved for summary judgment on grounds that plaintiff's lawsuit is barred by the three year statute of limitations set forth in Conn.Gen.Stat. § 52–577a (Supp.1990). For the following reasons, Grace's motion should be granted. Fed. R.Civ.P. 56.

### I.

Under Rule 56, Fed.R.Civ.P., summary judgment is appropriate where the moving party sustains its burden of showing both that there are no disputed issues of material fact and that it is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The failure to establish either of these things, or to dispel uncertainty as to the true state of the material facts, defeats a Rule 56 motion. *Quinn v. Syracuse Model Neighborhood Corp.,* 613 F.2d 438, 445 (2d Cir.1980).

Similarly, "[i]f the party opposing summary judgment 'generates uncertainty as to the true state of the material fact, the procedural weapon of summary judgment is inappropriate.'" *National Union Fire Insurance Co. v. Turtur,* 892 F.2d 199, 203 (2d Cir.1989). However, the "mere existence of factual issues—where those issues are not material to the claims before the court—will not suffice to defeat a motion for summary judgment." *Quarles v. General Motors Corp. (Motors Holding Div.),* 758 F.2d 839, 840 (2d Cir.1985).

In considering a motion for summary judgment, the court's function is not to resolve genuinely disputed factual questions, but merely to determine as a threshold matter whether there are unresolved, genuine issues of material fact to be tried. *Heyman v. Commerce and Industry Ins. Co.,* 524 F.2d 1317, 1319–20 (2d Cir.1975). When making this determination, "[a]ll reasonable inferences and any ambiguities are drawn in favor of the non-moving party." *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990). "Uncertainty as to the true state of any material facts defeats the motion." *U.S. v. One Tinto-*

*retto Painting,* 691 F.2d 603, 606 (2d Cir. 1982).

"Although the basic summary judgment principles govern, summary judgment may be particularly appropriate as to statute of limitations issues, since that defense often does not involve a genuine question of material fact." 6 Pt. 2 J. Moore, *Federal Practice* ¶ 56.17[58] at 606. This has been long recognized in the Second Circuit. *DeLuca v. Atlantic Refining Co.,* 176 F.2d 421, 424 (2d Cir.1949) (L. Hand, J.); *Peto v. Madison Square Garden Co.,* 384 F.2d 682, 683 (2d Cir.1967), *cert. denied,* 390 U.S. 989, 88 S.Ct. 1185, 19 L.Ed.2d 1293 (1968).

## II.

BellSouth commenced this action on January 19, 1993, alleging that it had suffered property damage as a result of asbestos-containing sprayed-on fireproofing which was made and sold by Grace, and installed in Bellsouth's Birmingham, Alabama, building (the "Building") between 1969 and 1971. The controlling statute of limitation provides as follows:

> (a) No product liability claim.... shall be brought but within three years from the date when the injury, death or property damage is first sustained or discovered or in the exercise of reasonable care should have been discovered.

Conn.Gen.Stat. § 52–577a. The issue presented by the pending motion for summary judgment is whether BellSouth's claim against Grace is barred under § 52–577a, or whether genuine issues of material fact preclude such a determination.

■ Judge Nevas's ruling in *West Haven School Dist. v. Owens–Corning Fiberglas,* 721 F.Supp. 1547 (D.Conn.1988), provides the court with guidance in applying Conn.Gen. Stat. § 52–577a in an asbestos abatement suit. Focusing on the statute's use of the words "when the ... property damage is first sustained or discovery or in the exercise of reasonable care should have been discovered," Judge Nevas held that for the statute to be triggered:

> The harm to be alleged must have become actionable; that is, the plaintiff must have discovered all of the essential elements of the cause of action it seeks to assert. In the present case, in addition to the *tortious conduct* on the part of the defendants, there must have existed *actual injury* to the plaintiff ..., and the [plaintiff] must have known that there was a *causal connection* between the conduct and the injury.

721 F.Supp. at 1556 (Emphasis added). In the context of an action like the present one, this means that the statute begins to run when the plaintiff "may be charged with having knowledge of the asbestos hazard in its building[ ] and of its responsibility for abatement." *Id.*

■ Defendant Grace contends that it is entitled to summary judgment because the evidence establishes clearly and unequivocally that well before January 19, 1990, BellSouth had sufficient knowledge of the existence of a cause of action to trigger the statute of limitations. The evidence that Grace points to in support of this proposition is compelling. In Grace's view, with which the court agrees, the evidence is sufficiently strong that BellSouth's requisite knowledge cannot be genuinely disputed.

The evidence indicates that BellSouth was aware in the early 1980s of the health hazards that were presented by asbestos in its buildings. Not only was BellSouth generally aware of the dangers of asbestos, but in a 1982 memorandum from a corporate vice-president to the managers of facilities in the present case and in three other states, BellSouth demonstrated its awareness of serious legal implications stemming from the presence of asbestos. Ex. A.

> Asbestos is safely present in our buildings in many forms. However, when this material is disturbed such as during remodeling and/or renovation, asbestos fibers can be released into the air circulating within the building. This condition is extremely hazardous and is also in violation of Federal law (through OSHA and EPA).

*Id.*

A May 9, 1983 memorandum from the Operations Manager in Birmingham, Alabama, also reveals that BellSouth was con-

cerned about asbestos contamination resulting from renovations.

> [BellSouth] cannot claim ignorance to [sic] the potential for danger that exists. We recommend that you become very familiar with the laws that currently exist concerning asbestos handling, removal, etc. We also recommend you advise your Area Safety Coordinator prior to the start of all projects which will involve asbestos. This is a subject that *must* be considered in *every* renovation/remodeling project and during day to day work around high probability sources for the material, namely duct/pipe insulation, plaster, gypsum wall board (circa 1960–1970), acoustical tile, etc. (Emphasis in original.)

Ex. B. In yet another memorandum issued the next week to safety coordinators in five states, BellSouth stressed that it was its responsibility to carefully monitor buildings to assure that work areas were not contaminated. Ex. C.

> It will be our responsibility to do whatever monitoring is called for to insure that the work environment is not contaminated. I also suggest that you work closely with the building personnel in policing contractors' activities for conformance with OSHA standards especially when non-conformance has the potential to impact upon the safety and health of our employees.

*Id.*

In 1984, BellSouth formed an Occupational Health Committee to develop "a standard policy relating to asbestos exposure." Ex. D. At the Committee's initial meeting, BellSouth's Richard T. Smith handed out a 43 page "Asbestos Information Manual" (Ex. EO) whose contents he had compiled. Ex. Y at 102–103. The Manual was intended to increase BellSouth's "knowledge of asbestos for future work operations." *Id.* at '0092. The manual reveals BellSouth's awareness of its legal obligation to abate friable asbestos in its buildings. *Id.* at '0119. The Manual further discusses, inter alia, a 1981 judicial decision that found the asbestos industry had deliberately concealed information dating back to the 1930's which showed a link between asbestos and lung disease. *Id.* at '0106. The Manual also commented that,

"Once a building owner knows or should know that asbestos hazards are present, a sharing of liabilities may well begin." *Id.*

In October 1984, BellSouth circulated a memorandum to all regional managers dealing with environmental, safety and building codes. Ex. F. This detailed, three page memorandum outlined a "control program" for friable asbestos, the first step of which was to survey buildings for "friable materials which may contain asbestos." *Id.* To carry out the inspection envisioned by step one, BellSouth retained Marsh & McLennon Protection Consultants ("M & M"), which inspected the Building and found, among other things, widespread asbestos "that can be easily disturbed, readily airborne and inhaled." Ex. G. The M & M survey also noted that employees were "directly exposed" in various areas of the Building. *Id.*

The evidence also shows that by 1986, BellSouth knew that all asbestos containing material would eventually have to be removed from the Building. After receiving the M & M survey, BellSouth formed "an informal team or committee . . . to consider and coordinate actions to be taken in response to the discovery of asbestos material." Ex. H. The committee was chaired by BellSouth's Mr. Bates of the Buildings and Real Estate Department, and also had representatives from BellSouth's legal, labor relations, safety, and public relations departments. *Id.*

Among the first steps taken by the committee was the hiring of Law Engineering to determine the level of airborne asbestos fibers in the Building. Ex. I. Also hired was Bull & Kenney Architects ("Bull & Kenney") to develop an interim Operations and Maintenance ("O & M") program to minimize exposure of the asbestos until the problem was solved by the complete removal of all asbestos containing material. Ex. J. Bull & Kenney's final report to BellSouth was issued in April 1986 and advised that about 83 percent of the Building was coated with asbestos-containing sprayed-on fireproofing. Ex. K at 3, 11.

The Bull & Kenney report also stated, among other things, that asbestos containing

material lay loose and dislodged atop ceiling tiles and lighting panels:

> [T]his debris was obviously the same as the fireproofing material, and samples tested were reported to contain asbestos. This debris varies in size from cornmeal grains to fist-sized clumps, and it consistently appeared to have been intentionally dislodged from the fireproofing to install hangers, conduit, etc. It is possible that some debris has been dislodged by vibration. (*Id.*)
>
> Laboratory reports of asbestos content of these dust materials are sufficient to cause an URGENT WARNING against the invasion of the ceiling tile surfaces without adequate personnel protection and training and against relamping and cleaning of light fixtures unless carried out under carefully controlled conditions by trained personnel with adequate personnel protection. Isolation of occupied space may also be required under certain circumstances.

*Id.* at 4. So pervasive was the contamination that "Fabric surfaces, including drapery, carpet, and upholstered furniture were observed to have been exposed directly to material which would be classified as a source of asbestos fiber. *Id.* at 5.

Bull & Kenney recommended that the asbestos containing material be completely removed.

> The large area and relatively high asbestos content of the potential fiber source, its exposure to the return air of the HVAC system, the fact that the existing suspended ceiling is not an efficient barrier, and the prospect of continued mechanical renovation and maintenance above ceilings which would disturb asbestos-containing materials are compelling reasons to *RECOMMEND:*
>
> Complete removal of the asbestos-containing fire-proofing material as the best method of abatement. Removal of the source is, of course, the only permanent remedy.

*Id.* at 9.

BellSouth, however, "felt that [it] could live with that building for a long period of time if [it] managed it in a way that didn't disturb the asbestos." Ex. AA at 14. Instead of following Bull & Kenney's recommendation of complete removal, BellSouth decided to deal with the Building's asbestos contamination according to company policy, which called for the removal of asbestos from BellSouth buildings over a thirty year period. Ex. Z at 44. As Vice President Charles S. Ferris testified at his deposition:

> "... in essence, it was a situation that we needed to continue to monitor ... and do certain things in the day-to-day maintenance of the building to keep from disturbing asbestos, and if we did those and continued to monitor the building for asbestos in the air and it continued to be low, that's something that we would be able to live with for an indeterminate period of time."

Ex. AA at 13.

In the fall of 1986, BellSouth hired BCM Engineers, Inc., ("BCM") to devise a long term removal proposal in keeping with BellSouth's thirty year asbestos removal policy. This approach was less expensive than the immediate removal of all asbestos, but still proved costly. Ex. DD at 40. In the first nine months of 1986 alone, BellSouth incurred costs of over $160,000 in dealing with asbestos in the building. Ex. O at 2.

It appears that by March of 1987, BellSouth had reevaluated its policy of removing asbestos containing materials over a thirty year period, in favor of an ad hoc policy of not removing such material when it is "in well-maintained condition ..," and limiting abatement to situations where asbestos-containing material is directly disturbed, is within a renovation/demolition area, or is damaged beyond economical repair or maintenance. Ex. P.

As part of this new approach, BellSouth again retained BCM, this time to prepare a study comparing the relative advantages of removing all asbestos-containing material from the Building, as opposed to continuing its existing O & M program. Ex. Z. BCM also concluded that "it would be preferable to remove asbestos-containing materials rather than continue operations and maintenance." *Id.* at 7.

BCM estimated that the total cost of removal of the asbestos-containing material

from the Building in 1987 would be $10 million. *Id.* at 2. Postponing abatement until 2016, however, was estimated to cost $72 million, $36 million of which would be the cost of continuing BellSouth's O & M program for 30. *Id.* It was BCM's recommendation that BellSouth abate immediately and save money over the long run. BCM also advised BellSouth that extensive renovations or demolition could not be undertaken as long as asbestos were present. *Id.* at 3.

Nevertheless, BellSouth made a business decision not to follow BCM's recommendation. This decision was based at least in part on BellSouth's desire for short term savings. As Vice President Ferris testified, "we had to consider what the cost would have been ... versus continuing to operate with relatively minor inconvenience and costs." Ex. AA at 51.

BellSouth had estimated that continuing to "live with" its asbestos problem and dealing with it under its O & M Program would cost around $100,000 annually. Ex. T. However, by mid–1987, it was clear to BellSouth that the cost would be substantially more and was likely to increase over time and as Environmental Protection Agency rules on asbestos became more stringent. *Id.* BellSouth was correct in this regard, for in 1988 it paid more than $185,000 in additional maintenance costs related to the presence of asbestos in the Building. Ex. U. In 1988, three more localized abatement projects within the Building were undertaken at a cost of over $1 million. Ex. R. Between 1985 and 1990, BellSouth incurred over $500,000 in costs directly related to the O & M program. Ex. V.

The evidence Grace has mustered in support of this motion shows unmistakably that by late 1987, BellSouth knew of the asbestos hazard present in the Building, appreciated its nature and extent, and realized that abatement was both expensive and inevitable. Also, by late 1987, BellSouth already had incurred significant asbestos-related costs, and understood that by pursuing localized abatement even greater costs lay ahead. Furthermore, by late 1987 it appears that BellSouth knew that a legal remedy was then available to it.

A detailed, two page memorandum dated October 19, 1987, from BellSouth's Building Engineer, Paul Elkourie ("Elkourie") to Bell-South's Operations Manager, Philip Bates reveals that Elkourie had recently attended an Asbestos Abatement Cost Recovery Litigation Conference in Washington, D.C., and had reviewed "a publication by a national law firm on abatement cost recovery." Ex. W.

This memorandum specifically notes that building owners "have successfully brought suit against manufacturers, receiving large awards covering abatement costs plus punitive damages." *Id.* The memorandum conveys Elkourie's impression as to the size and vintage of buildings "best suited for cost recovery litigation." *Id.* The Elkourie memorandum further notes that the type of asbestos-containing material "best suited" for litigation are "plasters and fireproofing" with fireproofing being the best, as it is "easier to identify [the] manufacturer." *Id.*

Mr. Elkourie's memorandum also states that, "[o]bviously, the ... Building (a large building, completed in the early 1970's, and containing asbestos-containing fireproofing) ranks highest by all three criteria." *Id.* The Elkourie memorandum goes on to state, "[m]y recommendation is that South Central Bell determine whether it is interested in recovering abatement costs. This should be done as soon as possible since there may be some statute of limitations considerations." *Id.*

The memorandum then spells out in detail the steps which BellSouth should take were it interested in bringing a timely lawsuit to recover asbestos abatement costs for the Building. It specifically recommended that:

1. Our group have the ACM analyzed to determine the manufacturer. McCrone does a lot of this type of analysis and has formulas for the different products. I can have samples taken, analyzed and preserved with establishment of the proper chain of custody.

2. Legal Department have a paralegal research records to determine the manufacturer.

3. If the manufacturer can be determined and it is one that can still be sued, Legal

should retain the services of attorneys specializing in asbestos abatement cost recovery litigation. I can provide the names of the most successful ones.

*Id.* at 1–2.

### III.

Based on all of the foregoing, it appears, and the court finds, that there is no *genuine* issue to be tried as to the following *material* facts, and those set forth in Grace's Local Rule 9(c)(2) statement (Dkt. # 82):

1. BellSouth Telecommunications, Inc. ("BellSouth") is a Georgia corporation whose principal place of business is in Georgia.

2. BellSouth is the owner of a building located at 600 North 19th Street, Birmingham, Alabama.

3. BellSouth knew before January 19, 1990 of the health hazards associated with the use of sprayed-on asbestos-containing products in BellSouth's buildings.

4. BellSouth believed and stated well before January 19, 1990, that it had a legal obligation to abate friable asbestos during any significant renovation or demolition of asbestos-containing buildings.

5. Before January 19, 1990, BellSouth published documents summarizing court decisions which BellSouth characterized as finding that the asbestos manufacturing industry had knowledge in the mid–1930's of the dangers of asbestos, but had participated in obscuring the link between asbestos and fatal diseases.

6. BellSouth knew before January 19, 1990, that it had incurred at least $500,000 in costs as a result of its asbestos Operations and Maintenance ("O & M") Program in the Building and at least $1.2 million in costs removing asbestos sprayed-on fireproofing from the Building.

7. BellSouth believed before January 19, 1990, that complete removal of the asbestos-containing sprayed-on fireproofing from the Building would eventually be necessary.

8. BellSouth knew before January 19, 1990, that it would incur significant costs upon the removal of the asbestos fireproofing from the Building.

9. BellSouth knew before January 19, 1990, that two consultants it had retained to study the issue had recommended immediate removal of the asbestos sprayed-on fireproofing from the Building.

10. BellSouth knew before January 19, 1990, of its right to bring legal action to recover asbestos abatement costs for the Building.

### IV.

Grace's arguments are precise and firmly grounded on the plain language of the applicable Connecticut statute of limitation, Conn. Gen.Stat. § 52–577a. According to Grace, BellSouth knew it had sustained an actionable injury or property damage well before 1990. In Grace's view, the evidence irrefutably shows that BellSouth knew that its Building had asbestos-containing sprayed on fire-roofing—material which was dangerous and required abating—and for whose abatement BellSouth paid hundreds of thousands of dollars *in the 1980's.*

As the Elkourie memorandum establishes, BellSouth also knew in the 1980's that it had a cause of action at that time to recover abatement costs. Therefore, according to Grace, this lawsuit was brought more than "three years from the date when the injury . . . or property damage is first sustained or discovered or in the exercise of reasonable care should have been discovered." *Id.*

BellSouth attempts to escape the implications of this by arguing that Grace misperceives both the nature of BellSouth's claim and the theory underlying such litigation generally. According to BellSouth, Grace "has overlooked the fact that these are tort cases based on contamination—not economic loss cases." Plaintiff's Opposing Memorandum, Dkt. # 85 at 1. Thus, BellSouth maintains that Grace's arguments conflict with a "national view" regarding when asbestos abatement claims should be seen as accruing, a "big picture" of sorts that eclipses the plain words and meaning of the statute.

Second, in BellSouth's view, Grace's evidence is deficient because it merely shows that BellSouth was aware of a potential haz-

ard due to the presence of asbestos. *Id.* However, "the presence of asbestos and its *potential* hazards and/or recognition that the asbestos one day *in the future* must be removed ... does not trigger the statute of limitations," BellSouth asserts. *Id.* (Emphasis original). Rather, BellSouth argues, "[o]nly when hazardous asbestos fibers escape and contaminate is legal action cognizable." *Id.* at 4. In the present case, BellSouth represents, it "[d]id not know it had been damaged or suffered an actionable harm until it learned in December 1992, that the fireproofing was beginning to deteriorate, delaminate and contaminate its building." *Id.* at 2 ¶ 4.

Addressing the second of these contentions first, it appears that BellSouth simultaneously misconstrues Grace's argument and ignores what is undeniably shown by the evidence. Grace does not argue that simple discovery of the mere presence of asbestos triggers the statute of limitations. Rather, Grace argues that the statute was triggered when BellSouth began to incur abatement costs that it knew were causally connected to actionable tortious conduct. *West Haven, supra,* 721 F.Supp. at 1556. The evidence irrefutably shows that this certainly had occurred by the time of the Elkourie memorandum: October 19, 1987, at the very latest. There can be no genuinely disputed issue over this.

As Judge Nevas framed the issue in *West Haven,* in the context of an asbestos abatement suit, the relevant inquiry under Connecticut's statute of limitations is "when the [plaintiff] may be charged with having knowledge of the asbestos hazard and its responsibility to abate...." *Id.* BellSouth's commencement of abatement is powerful objective evidence that it recognized its responsibility to abate. The irrefutable facts adduced by Grace in support of the pending motion also establish that this "knowledge" and "responsibility" occurred well before January of 1990.

This is not at all discordant with the "big picture," nor did Judge Nevas's decision in *West Haven* do anything but faithfully apply the language employed by the Connecticut legislature, language which the court is not free to brush aside. To the extent BellSouth argues otherwise, it is incorrect.

BellSouth's "contamination" arguments do not help it here either. They are unavailing because abatement in this case evidences both contamination and responsibility to abate. Though BellSouth will not acknowledge it, there is strong evidence of "contamination" of which it was unquestionably aware in the 1980's. Grace's moving papers recount this evidence in detail, noting multiple instances where BellSouth's own documents repeatedly refer to "contamination" and "contaminated" areas within the Building. *See* Grace's Reply Memorandum, Dkt. # 95 at 3–11. Thus, even were BellSouth's "contamination" arguments accepted, it is inescapable that the Connecticut statute was triggered in this case well before January 1990.

Because this is so, it is not necessary to dwell on Grace's argument that the so called "contamination theory" ought to be rejected on policy grounds or because it allows plaintiffs to "pick and choose a convenient ... date for the statute of limitations to begin running." *Id.* at 14, citing *Roseville Plaza Limited Partnership v. U.S. Gypsum Co.,* 31 F.3d 397, (6th Cir.1994); *Appletree Square 1 Limited Partnership v. W.R. Grace & Co.,* 815 F.Supp. 1266 (D.Minn.1993). Grace, however, is correct that the case for summary judgment here is much stronger than it was in *Roseville. See Roseville Plaza Limited Partnership v. U.S. Gypsum Co.,* 811 F.Supp. 1200 (E.D.Mich.1992). And this is especially so in light of the Elkourie memorandum and the fact that abatement in BellSouth's Building actually began in the 1980's. *See MDU Resources Group v. W.R. Grace & Co.,* 14 F.3d 1274, 1279 n. 8 (8th Cir.1994) ("... remodeling could trigger abatement costs and would begin running the statute of limitations.").

The authorities which BellSouth cites in support of its position seem to be either inapplicable because of material factual differences (e.g., no abatement, no "contamination") or because they implicate statutes substantially different from Connecticut's. For example, unlike in *Adams–Arapahoe School District v. GAF Corp.,* 959 F.2d 868 (10th

Cir.1992), Connecticut's statutory scheme does not restrict recovery to those cases where property other than the defective product itself is harmed. Conn.Gen.Stat. § 52–572m(d). And, here, there is both abatement and irrefutable evidence of contamination. *See,* e.g., Ex. L (BellSouth's letter to contractors warning that the Building contains "friable asbestos-containing materials.").

Try though it does, BellSouth cannot strip its 1980's abatement efforts of their evidentiary force and legal significance by disclaiming any intention of seeking recovery of their cost as an item of damages. *See* BellSouth's Sur Reply, Dkt. # 100 at 6. BellSouth must live with its own action or inaction irrespective of whether it seeks recovery on account of it.

### V.

■ The argument that the statute could not have been triggered due to BellSouth's ignorance of the identity of the manufacturer of the sprayed-on fireproofing is unsound. The statute of limitations governing this case provides that the "clock" starts to run "when the property damage is first sustained or discovered or in the exercise of reasonable care should have been discovered." Conn. Gen.Stat. § 52–577a(a). The clear implication of this language is that a suitor must act with reasonable diligence both in discovering damage and in learning who is responsible for it.

BellSouth knew this as well before 1990. The Elkourie memorandum indicates that, as far back as October of 1987, BellSouth was told that, if it were interested in bringing suit and avoiding statute of limitations problems, it should promptly take steps to identify who made the asbestos-containing fireproofing. Ex. W. In the pre–1990 period, BellSouth was as capable of determining Grace's identity as it was in the post-January 1990 period. To accept BellSouth's argument that its ignorance of Grace's identity keeps the statute from being triggered would confer upon it the power to trump legislative intent by intentionally remaining ignorant until it decides to act. The Connecticut legislature did not intend this, and a United States court

sitting in a diversity case should be slow to ascribe such an intent to it.

Grace's motion is predicated on documents which speak for themselves and do not require either favorable credibility determinations or the impermissible drawing of inferences in Grace's favor. On their face, these documents convincingly indicate that before 1990, BellSouth had sufficient knowledge to trigger the three year statute of limitations, Conn.Gen.Stat. § 52–577a(a). The papers that BellSouth has submitted in opposition to Grace's motion, on the other hand, do not raise a genuine issue with respect to BellSouth's knowledge of the facts embodied in Grace's exhibits. Where, as here, the moving party's papers are sufficient, the party opposing summary judgment must come forward with competent evidence that is both material and of a substantial nature. Moore, *supra,* ¶ 56.15[3] at 273. BellSouth has not done this.

To the extent the affidavits which BellSouth has submitted contain *facts,* as opposed to conclusions, to which the affiants are *competent* to attest, Moore, *supra,* ¶ 56.11[3] at 126, the court accepts them as true for present purposes. The court cannot accept as true self-serving conclusions, incompetently asserting such things as "we had no reason to believe . .;" "we did not know . .;" "at no time were we aware;" "we had a heightened awareness," etc., which are interspersed throughout the affidavits BellSouth has submitted. *See e.g.,* Affidavits of Smith, McPherson, Geisler, Elkourie, Bates, Crotty. In addition, since the relevant inquiry is what BellSouth knew, rather than what certain individuals now contend they purportedly did not know prior to 1990, BellSouth's papers do not adequately meet Grace's submissions head-on in any event.

BellSouth's opposition papers dispute the significance of the facts which Grace has brought to the Court's attention, rather than call into question whether those submissions have the status of facts or whether material issues exist with respect to them. Thus, for example, BellSouth does not deny that prior to 1990, it warned contractors of the presence of friable asbestos in the Building, nor does it dispute what the Elkourie memoran-

dum says. Rather, BellSouth argues the legal significance *vel non* of such facts. The significance of the facts which both sides have adduced, however, is itself a question of law. Schwarzer, *The Analysis and Decision of Summary Judgment Motions,* 139 F.R.D. 441, 458 (1991). The undisputed historical facts in this case establish as a matter of law that Conn.Gen.Stat. ¶ 52–577a(a) was triggered before 1990.

Although some language in *Matsushita Electrical Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), suggests that summary judgment is appropriate where an opponent's facts require an "implausible inference," *id.,* at 593, 106 S.Ct. at 1359, cited in Schwarzer, *supra,* 139 F.R.D. at 491, as does Professor Moore, *Federal Practice* ¶ 56.11[3] at 123, in the present case, it appears that summary judgment is appropriate not so much on the foregoing grounds, but because the competent evidence with which BellSouth has come forward is simply insufficient as a matter of substantive state law to create a jury issue.

Completely apart from the implausibility of BellSouth's contention that it did not know until the 1990's that it could sue in tort for the alleged asbestos contamination of its skyscraper corporate headquarters, the statute in this case places a responsibility on the court to assess the sufficiency of an opponent's evidence as a matter of state law before treating timeliness of suit as a question of fact for a jury. In so assessing it, the court finds that the competent facts set forth in the affidavits and opposing papers do not create a genuinely disputed issue of material fact, and, as a matter of law, BellSouth's suit is barred by the statute of limitations.

The court further finds that, among other things, BellSouth's own documents show on their face that it knew well before 1990 that: the Building contained friable asbestos; asbestos dust and debris was throughout the building; carpets, draperies and furniture were contaminated; fibers were being released into the air when contact was made with the fireproofing; people working above the suspended ceiling required respirators; abatement was necessary and had been done for safety reasons; and, eventually, the entire Building would have to be abated. In addition, before 1990, BellSouth actually spent over $2 million to abate, operate and maintain the Building.

There is no genuine issue of material fact that BellSouth's cause of action accrued before January 1990, and the evidence is such that no reasonable jury could find otherwise. This is so even accepting BellSouth's argument that it did not know whom to sue prior to January 19, 1990, because, in the exercise of reasonable diligence, plaintiff should have discovered whom to sue well before that date.

In an attempt to defeat Grace's motion, BellSouth also puts before the court evidence which allegedly establishes that during the 1980's Grace engaged in a program of dissembling and disinformation designed to deceive and mislead building owners into believing that they did not have a cause of action to recover the cost of asbestos abatement. In particular, BellSouth calls the court's attention to the publication of a misleading booklet by an organization known as the Safe Buildings Alliance ("SBA"), which BellSouth characterizes as a "front" for Grace, whose purpose was to "convince building owners to forego asbestos removals." BellSouth Memorandum, Dkt. # 85 at 13. BellSouth further contends that it relied upon this disinformation "in reaching the decision that the fireproofing did not pose a safety hazard warranting removal." *Id.*

■■■ For purposes of this motion only, the court assumes that BellSouth's allegations are true. Despite this assumption, Grace's own documents show on their face that BellSouth not only knew of its tortious injury and cause of action therefor prior to 1990, but as far back as 1987, actually considered whether to bring an abatement action. Ignorance of a "right of action" is an indispensable element of the theory of fraudulent concealment. *Hamilton v. Smith,* 773 F.2d 461, 468 (2d Cir.1985). Since BellSouth had actual knowledge of its cause of action before 1990, Grace's alleged misconduct could not have caused BellSouth to be ignorant of it, and does not, therefore, generate a material factual issue.

BellSouth's attempted invocation of the doctrine of estoppel is also unavailing. Reduced to its essence, the argument is that Grace should be denied the protection of the statute of limitation because it is a wrongdoer and has behaved reprehensibly. BellSouth cites no authority for the proposition because there is none under the substantive law of Connecticut. *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).

There is also no merit to BellSouth's suggestion that summary judgment is inappropriate because Grace's arguments to the court conflict with positions Grace has taken at other times and places. For example, BellSouth argues that the pending motion should be rejected because Grace has denied that its products are unsafe or dangerous. Therefore, according to BellSouth's argument, it is improper for Grace now to take the position that its product caused "contamination" prior to 1990. A fallacy in the argument is that for purposes of a Rule 56 motion, it is entirely appropriate for Grace to accept BellSouth's premises. In addition, the Federal Rules of Civil Procedure do not reserve motions for summary judgment only to those litigants who admit they would be liable but for the existence of a good affirmative defense. 6 Pt. 2 J. Moore, *Federal Practice* ¶ 56.17[4] at 381.

Time prevents the court from addressing each and every argument that BellSouth offers in opposition to this motion. Although each such argument has been considered, none is meritorious. Grace's motion should be granted. This is a recommendation made pursuant to 28 U.S.C. § 636(b). BellSouth is free to seek the district judge's review of the magistrate judge's recommendation. *See* Local Rules for the District of Connecticut.

Dated at Hartford, Connecticut, this 15th day of November, 1994.